UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X

UNITED STATES OF AMERICA,

                                    **MEMORANDUM & ORDER**
                                    13-CR-486 (KAM)

    -against-


COLETTE ROBERTSON,

                   Defendant.
------------------------------------X
**MATSUMOTO, United States District Judge:**

        Before the court are applications from the government
and the defense counsel for a finding regarding defendant
Colette Robertson's competency to stand trial and/or enter a
plea in this action.  For the reasons discussed below, the court
finds that Ms. Robertson is able to "understand the nature and
consequences of the proceedings against [her]" and "assist
properly in [her] defense," 18 U.S.C. § 4241(d), and therefore
is competent to stand trial and/or enter a plea.

BACKGROUND

        On August 16, 2013, a grand jury charged defendant
with eight counts of conspiracy to sexually exploit children,
sexual exploitation of a child, and attempted sexual
exploitation of a child, all in violation of 18 U.S.C. § 2251.
(*See* ECF No. 13, Indictment.)  On August 5, 2014, defense
counsel filed a report from Marc Janoson, Ph.D., in which Dr.
Janoson concluded that defendant was not competent to enter a

plea.  (ECF No. 61 (the "Janoson Report").)  At the request of the government (*see* ECF No. 63), the court ordered defendant to submit to a psychological examination with Barry Rosenfeld, Ph.D., in advance of an evidentiary hearing pursuant to 18 U.S.C. § 4241.  (ECF No. 63; *see also* Minute Entry dated 9/30/14; ECF No. 65-1; Report of Dr. Barry Rosenfeld (the "Rosenfeld Report").)  On October 16 and November 5, 2014, the court conducted a hearing with testimony from Drs. Janoson and Rosenfeld to determine whether defendant is competent to stand trial and enter a plea (ECF Nos. 69-70, Transcripts of 10/16/14 and 11/5/14 Hearings), after which the parties submitted post-hearing briefs.  (*See* ECF No. 71, Letter from Paul Martin, Esq. ("Def.'s Letter"); ECF No. 72, Gov't Post-Hr'g Mem. of Law; ECF No. 74, Gov't Letter in Opp. to Def.'s Letter.)

## I.    The Competency Hearing

### A.    Defense Witness: Marc Janoson, Ph.D.

Dr. Janoson, a licensed clinical psychologist with a specialty in forensic psychology and assessment, was called by the defense after having met with and tested defendant over three days at the request of her counsel in order to assess whether she was competent to enter a plea.  (ECF No. 69, Transcript of Oct. 16 Hearing ("Oct. 16 Tr.") at 6-7.)  Dr. Janoson has been qualified as an expert in forensic psychology on numerous occasions but, as of the date of the hearing, has

only testified for the defense.  (*Id.* at 6, 32.)  Dr. Janoson

met with defendant on three occasions for a total of almost ten

hours, during which time he interviewed her and administered

three psychological assessments, the Minnesota Multiphasic

Personality Inventory-2 (MMPI-2), the Personality Assessment

Inventory (PAI), and the MacArthur Competence Assessment Tool-

Criminal Adjudication (MacCat-Ca).  (*Id.* at 7-8; *see also*

Janoson Report at 4.)  Based on the results of his evaluation,

Dr. Janoson issued a report dated July 22, 2014, admitted at the

hearing as Defense Exhibit A, in which he diagnosed the

defendant with paranoid schizophrenia and opined that she was

not competent to enter a plea.  (*See* Janoson Report at 2.)

Defendant relayed a wide range of background

information to Dr. Janoson, including her work, her immigration

to this country, and her personal relationships with her

daughter and Mr. Yard, a co-defendant in this case.  (Oct. 16

Tr. at 11, 37).  Defendant also told Dr. Janoson that she

experiences auditory hallucinations that began after her arrest

in this case, and that she had been the victim of sexual abuse

as a child and was physically and emotionally abused by Mr.

Yard.  (*Id.* at 12, 38.)  At the time she saw Dr. Janoson,

defendant indicated that she was taking Seroquel, an

antipsychotic medication, and Celexa and Wellbutrin, both

antidepressant medications.  (*Id.* at 12.)  Dr. Janoson

acknowledged that the condition with which he diagnosed defendant, schizophrenia, typically manifests in individuals between their late teenage years and mid-30s, and that defendant did not report any prior psychiatric history, nor present several other typical signs of schizophrenia, including disorganized speech, frequent derailment or incoherence, grossly disorganized behavior, or diminished emotional expression. (*Id.* at 36-40.)

Dr. Janoson administered the MMPI-2 to defendant twice and submitted each assessment to The Caldwell Report for scoring. (*Id.* at 10, 13.) Both times, the computer-scored test reports were marked invalid because defendant had given so many atypical responses to the test questions.[1] (*Id.* at 13-14.) Dr. Janoson testified that such an outcome could reflect either exaggeration by defendant or a disturbance so severe that her responses were "off the charts." (*Id.* at 13.) The Caldwell Report has a less rigid approach to scoring than Pearson, the other scoring service for the MMPI-2, and thus, has a higher threshold for atypical responses before invalidation of a protocol. (*Id.* at 34.)

---

[1] Specifically, the report cover letters noted that Ms. Robertson "made so many atypical and rarely given responses on the test that the profile cannot be interpreted; to treat it as if it were valid would be misleading if not unethical. The enclosed report reflects what inconsistencies there may have been in their responses. The extra scale printout is enclosed to provide you with scores on the supplemental validity scales. . . . The other scales should be ignored as probably being excessively distorted." (Gov't Ex. 3; *see id.* at 42-43.)

After receiving the second invalidation, Dr. Janoson reviewed the first profile to interpret the data as best he could, despite the warnings contained therein. (*Id.* at 14, 17, 43-44.) Dr. Janoson testified that, based on his training by Alex Caldwell, the author of the Caldwell Report, and David Nichols, the author of Essentials of MMPI-2 Assessment, he would regularly override scoring rejections of MMPI-2 assessments where other scales – namely, the VRIN, TRIN, F(p), and/or the Gough index – were in an acceptable range. (*Id.* at 14-18.) The VRIN (Variable Response Inconsistency) and TRIN (True Response Inconsistence) scales measure whether the subject answers the content and the form of the questions consistently, and, according to Dr. Janoson, defendant's scores on both scales were within the normal range. (*Id.* at 15-16.) Although defendant's score on the F(p) (Infrequent Psychopathology) scale was high, Dr. Janoson chose to interpret the profile because there was some overlap between the F(p) scale and the FAMILY scale; accounting for this overlap brought defendant's F(p) score down to a level that was high but interpretable, according to Dr. Janoson. (*See id.* at 16-17, 32.) Dr. Janoson interpreted these scales as demonstrating that defendant was actually responding to the test and not answering randomly. (*See id.* at 22, 47.) He testified that it was unlikely that a person could produce a profile similar to defendant's by guessing what would make him

or her appear to be sick.  (*Id.* at 50.)

Dr. Janoson also testified that he saw in defendant's MMPI-2 profile what is called a "psychotic V configuration," where Scales 6 (Paranoia) and 8 (Schizophrenia) are elevated, but Scale 7 is considerably lower.  (*See id.* at 19.)

The PAI, the second assessment that Dr. Janoson administered to defendant, similarly indicated that defendant was over-reporting her distress and that any hypotheses drawn from the report may not be valid.[2]  (*Id.* at 19.)  Similarly to the MMPI-2, the results gave no indication of confusion, reading difficulties, or careless responding by the defendant.  (*Id.* at 51.)  Notwithstanding issues regarding invalidity and over-reporting, the computer-generated report also noted the most probable diagnosis of the subject (schizophrenia, paranoid type), and the psychotic V configuration was also present, paralleling the MMPI-2.  (*Id.* at 20.)

The third test administered to defendant was the MacCat-Ca, which, unlike the MMPI-2 and PAI, contains open-ended questions that would "assess Ms. Robertson's competence-related

---

[2] Specifically, the PAI report states, "[w]ith respect to negative impression management, there are numerous indications to suggest that the respondent was motivated to portray herself in an especially negative or pathological manner. With this configuration of scales, deliberate distortion of the clinical picture is likely.  Alternate explanations include that the yes results reflect a cry for help, or a negative evaluation of one's life. The test results are likely to contain considerable distortion."  (Janoson Report at 6.)  Dr. Janoson stated in his report that defendant's "score on the Malingering Index is Raw Score 6 (T-125) and therefore does raise questions of overt efforts to exaggerate/malinger a mental disorder."  (*Id.* at 6-7.)

abilities." (*Id.* at 24.)  Unlike the MMPI-2 and the PAI, the
MacCat-Ca does not have a scale to assess exaggeration or
malingering.  (*Id.* at 54.)  Dr. Janoson scored defendant's
responses and found that defendant was deficient on the
"understanding" and "appreciation" subtests.  (*See* Janoson
Report at 10.)

On cross-examination, Dr. Janoson testified that in
response to a question asking defendant to assess the likelihood
of her pleading guilty relative to other similarly-situated
defendants, Ms. Robertson responded that she wasn't sure.  (Oct.
16 Tr. at 55.)  When prompted for her reasons, she responded
that, while the prosecutor was currently discussing 15 years
with defendant, her charges were "30 years stuff," she didn't
think she should go to jail, and she wanted to be deported right
away instead.  (*Id.* at 55.)  Despite defendant's apparent
understanding of the minimum and maximum sentences, as well as
the consequence of deportation if she is convicted, Dr. Janoson
scored her response with zero out of a possible two points "with
regards to the appreciation as to what she would do if she were
made an offer," because she was not able to commit herself to an
answer.  (*Id.* at 56.)

Dr. Janoson concluded that if defendant could not
remember the alleged offense conduct, then she could not assist
her attorney and therefore would not be competent to stand trial

or enter a plea. (*See id.* at 23.) He acknowledged, however, that he "would be troubled if the only thing [defendant couldn't] remember is the alleged crimes." (*Id.* at 31.) Dr. Janoson opined that defendant suffers from a severe mental illness, and although she is likely exaggerating her distress (*id.* at 25, 28, 47), she is not malingering or feigning her symptoms outright. (*Id.* at 25, 29; *see also* Janoson Report at 2.) Dr. Janoson also acknowledged that an individual with schizophrenia would not be *per se* incompetent to enter a plea.

### B. Prosecution Witness: Dr. Barry Rosenfeld

The government called Barry Rosenfeld, Ph.D., a board-certified forensic psychologist and professor of psychology at Fordham University who has practiced for over twenty years. (Oct. 16 Tr. at 59-60.) He has testified as an expert in competency proceedings on numerous prior occasions, both for the defense and the prosecution. (*Id.* at 63-64.) Dr. Rosenfeld met with Ms. Robertson for two hours, during which time he conducted a background interview and verbal mental health examination, as well as questioned Ms. Robertson generally about her case. (*Id.* at 65-67.) He did not administer any personality assessments to defendant because it would be inappropriate to re-administer the tests conducted by Dr. Janoson a few months earlier. (*Id.* at 67-68, 112-14.) Dr. Rosenfeld reviewed Dr. Janoson's report, the test data, FBI records, and a written statement by Ms.

Robertson.  (*Id.* at 65.)

During the interview, defendant reported that her psychiatric symptoms — namely, hallucinations — first appeared after her arrest.  (*Id.* at 69, 72.).  She described experiencing other symptoms of depression, though Dr. Rosenfeld observed that her demeanor during the appointment was not consistent with the described symptoms.  (*Id.* at 68-70, 105-106.)  In his testimony, Dr. Rosenfeld noted that patients suffering from depression that experience auditory hallucinations are typically at "the end of very, very serious depression" and so dysfunctional that they "can't get out of the house, they can't respond to you when they are asked questions."  (*Id.*; *see also id.* at 73.)  Based on his observations of defendant, Dr. Rosenfeld concluded that, while she presented some symptoms of depression,[3] he could not diagnose her with a depressive disorder.  (Oct. 16 Tr. at 70, 109-110; Nov. 5 Tr. at 7-13.)

Neither did Dr. Rosenfeld find that there was any evidence supporting Dr. Janoson's diagnosis of schizophrenia. (*Id.* at 72.)  Although defendant had reported experiencing hallucinations after her arrest, she did not present any other

---

[3] Dr. Rosenfeld noted that defendant had expressed having fleeting suicidal thoughts on one occasion several months prior to her meeting with Dr. Rosenfeld.  *Id.*  At the time defendant saw Dr. Rosenfeld, she was taking Klonopin, an anti-anxiety medication, Wellbutrin, an antidepressant, and Abilify, which is used in conjunction with other medications to treat bipolar disorder.  (ECF No. 70, Transcript of Nov. 5 Hearing ("Nov. 5 Tr.") at 6.) Dr. Rosenfeld explained that he could not infer why defendant was prescribed certain medication, but he did not see any evidence of bipolar disorder – namely any history of a manic episode.  (*Id.* at 4, 9-10.)

symptoms consistent with schizophrenia. (*Id.*) Furthermore, the timing of defendant's hallucinations (*i.e.,* reportedly commencing after her arrest) did not support a finding of schizophrenia, which Dr. Rosenfeld noted is tied to genetics, manifests in the late teens or twenties, develops "relatively gradually," renders the person unable to function in most domains of life, and is a "very serious and severe disorder that is evident long before someone gets arrested." (*Id.* at 72-73.) Dr. Rosenfeld reported that although defendant was prescribed Abilify, which is classified as an antipsychotic drug, it is "not a first line antipsychotic medication," but is typically "used to augment antidepressants." (*Id.* at 74.)

Although Dr. Rosenfeld did not re-administer any personality inventories to defendant, he reviewed the MMPI-2, PAI, and MacCat-Ca profiles from Dr. Janoson's earlier testing of defendant. (*See id.* at 67; Rosenfeld Report at 1.) Dr. Rosenfeld found the evidence of symptom exaggeration in the MMPI-2 profile to be "almost too blatant" and far beyond what a deeply mentally-ill individual, including one with schizophrenia, would score. (*Id.* at 76-80.) He explained that defendant's VRIN and TRIN scores support his conclusion of blatant symptom exaggeration by defendant because the scales indicate that she read each question and answered them deliberately rather than randomly. (*Id.* at 80-81.) Dr.

Rosenfeld compared defendant's score on the F and F(p) scales with the meta-analysis published in a recent journal article, "Detection of Feigned Mental Disorders, a Meta-Analysis of the MMPI-2 and Malingering." R. Rogers[4] et al., *Detection of Feigned Mental Disorders, a Meta-Analysis of the MMPI-2 and Malingering*, 10 Assessment 160 (2003) (admitted as Gov't Ex. 4). Defendant's F and F(p) scores of 120 (the maximum score) were "way, way above" the average F and F(p) scores for "presumably genuine" patients with schizophrenia, 80 and 66 respectively. (*Id.* at 84.) The discrepancy was even higher when comparing defendant's scores, which were "implausibly high," to the averages for severely depressed individuals; defendant's F and F(p) scores were higher than the average for those feigning symptoms, as well. (*Id.* at 84-85.)

Dr. Rosenfeld concluded that defendant's high scores were due to exaggeration and were not due to extreme mental distress. He explained that if "genuine patients" scored "anywhere near" the high levels reflected in defendant's scores, "they are so visibly impaired that they are in psychiatric hospitals. . . . They are not able to attend appointments or show up at their Probation office or live independently." (*Id.* at 85.) Dr. Rosenfeld noted that he would be more cautious

---

[4] Dr. Rosenfeld described Richard Rogers as "one of the world's leading experts on malingering." (*Id.* at 83.)

about his assessment were it not for the extreme nature of defendant's scores. (*Id.* at 86-87; *see also id.* at 95.) Dr. Rosenfeld also observed that there was evidence of exaggeration in defendant's PAI results and stated that he did not agree with Dr. Janoson's decision to interpret the MMPI-2 and PAI profiles after they were invalidated during computer scoring. (*Id.* at 89-90; *see also id.* at 95.)

Dr. Rosenfeld testified that defendant's elevated scores on Scales 6 and 8, forming the "psychotic V" configuration, were not conclusive evidence of schizophrenia or other psychosis. (*Id.* at 87; Nov. 5 Tr. at 16-17.) He explained that subjects can selectively endorse symptoms without much difficulty, and that defendant's scales were elevated across the board, and not just for schizophrenia and psychosis. (Oct. 16 Tr. at 87-88.)

Defendant reported neither psychiatric disturbances nor any functional impairment prior to her arrest to Dr. Rosenfeld. (Oct. 16 Tr. at 91.) She had been working at the same job for ten years, caring for her daughter, and living with her daughter. (*Id.*) She reported an inability to remember only the alleged offense conduct. (*Id.* at 116.) Although Dr. Rosenfeld did not elicit from defendant a detailed history of other events around the time of the alleged offense conduct, he found that defendant was able to recall and describe information

from that time period and did not report any other memory impairment, except the charged offense conduct, during her interview.[5] (*Id.* at 92.) Dr. Rosenfeld explained that discrete periods of amnesia can commonly result from a traumatic event, but they generally encompass a period of time rather than particular events during a given time period. (*Id.*) Dr. Rosenfeld noted that there was no diagnosis that would be consistent with the purported amnesia about the charged conduct. He explained that there is no diagnosis of post-traumatic stress disorder and that neither schizophrenia nor depression "coincide with" or include amnesia. (*Id.* at 100.) He acknowledged that amnesia could render a defendant incompetent to stand trial under certain circumstances, but he did not see any indication that defendant's purported amnesia in this case, if accepted as genuine, would interfere with her competence to stand trial. (Nov. 5 Tr. at 15-16.) Moreover, he noted that defendant provided a detailed statement of her involvement in the charged conduct to the FBI, thus undercutting her claims of amnesia. Dr. Rosenfeld was provided with the statement after his examination of the defendant so he did not ask her to explain her current inability to recall during his examination. (Oct.

---

[5] On cross-examination, defense counsel questioned Dr. Rosenfeld about defendant's memory of her childhood, including sexual abuse she had suffered. (*Id.* at 100-104.) Dr. Rosenfeld recalled that defendant was unable to give a clear account of her history of abuse, but he could not determine whether her vague responses were due to amnesia. (*Id.*)

16 Tr. at 116-17.)

While discussing defendant's charges with her, Dr. Rosenfeld observed that defendant understood the charges she is facing, what a plea bargain is and the plea offered, who the attorneys were, and the roles of the prosecutor, judge, and jury. She reportedly expressed confidence in her attorney and said that she was willing to work with him and assist him. (*Id.* at 93.) Ms. Robertson also understood the evidence and was able to weigh pros and cons, including her likelihood of success at trial. (*Id.*) She had also indicated to Dr. Janoson that she understood the potential punishments, including the minimum and maximum sentence and deportation. (*Id.* at 55-56, 93.) Based on his examination of defendant, the assessments administered by Dr. Janoson, the lack of evidence of incompetence, and considerable evidence of competence, Dr. Rosenfeld concluded that defendant was competent to stand trial and enter a plea. (*Id.* at 92.)

## ANALYSIS

On a motion for an order declaring a defendant competent (or incompetent) to stand trial or enter a plea pursuant to 18 U.S.C. § 4241, the court must determine whether "the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the

proceedings against him or to assist properly in his defense. . . ." *United States v. Villegas*, 899 F.2d 1324, 1341 (2d Cir. 1990) (quoting 18 U.S.C. § 4241(d)) (internal quotation marks omitted).  A district court determines a defendant's competence by the preponderance of the evidence.[6]  *United States v. Morrison,* 153 F.3d 34, 46 (2d Cir. 1998); *United States v. Nichols,* 56 F.3d 403, 410 (2d Cir. 1995) (citing 18 U.S.C. § 4241(d)).  The district court may consider factors including medical opinions and the district court's observation of the defendant's demeanor and comportment in assessing competency. *United States v. Hemsi,* 901 F.2d 293, 295-96 (2d Cir. 1990); *see also Nichols,* 56 F.3d at 411.

"It is well-established that some degree of mental illness cannot be equated with incompetence to stand trial." *United States v. Vamos*, 797 F.2d 1146, 1150 (2d Cir. 1986).  Any mental illness from which a defendant suffers "must deprive the defendant of the ability to consult with his lawyer 'with a reasonable degree of rational understanding' and to understand the proceedings against him rationally as well as factually." *Nichols,* 56 F.3d at 412 (internal citations and quotation marks

---

[6] "[T]he allocation of the burden of proof is only relevant in those rare cases where the evidence is in equipoise." *United States v. Wolfson*, 616 F. Supp. 2d 398, 415 (S.D.N.Y. 2008) (citing *Nichols,* 56 F.3d at 410).  Because the evidence in this case clearly indicates the competence of defendant to enter a plea and stand trial, the court does not reach the issue of which party carries the burden of establishing defendant's competency.  *See United States v. Shenghur*, 734 F. Supp. 2d 552, 553 (S.D.N.Y. 2010), *aff'd*, 466 F. App'x 61 (2d Cir. 2012); *Wolfson*, 616 F. Supp. 2d at 415.

omitted).

As an initial matter, the court finds that the evidence before the court does not support a finding that defendant presently suffers from schizophrenia. The only symptom reported by defendant associated with schizophrenia was auditory hallucinations, which began after defendant's arrest. Both experts testified that defendant did not appear to present other symptoms typically present in individuals with schizophrenia, and that it would be unusual for symptoms to appear for the first time in a 46-year-old.

The only other basis for Dr. Janoson's diagnosis of schizophrenia was the "psychotic V configuration" in defendant's MMPI-2 profile. However, as Dr. Janoson admitted, defendant was apparently exaggerating her distress in her responses, resulting in her tests being deemed invalid by the scoring service. Although Dr. Janoson chose to interpret the results anyway, against what appears to be the prevailing opinion in the profession that treating the defendant's scores as valid "would be misleading if not unethical" (*see* Oct. 16 at 17), the court relies on the warnings provided by the Caldwell Report and the credible testimony of Dr. Rosenfeld[7] to conclude that the

_____

[7] Overall, the court found Dr. Rosenfeld's testimony to be particularly credible given his board certification, his history of testifying for both the prosecution and the defense, and the fact that he has previously found individuals incompetent. The court found Dr. Janoson's methodology and conclusions, however, to be less persuasive given the repeated indications

16

evidence presented does not indicate that defendant is suffering from schizophrenia.

Similarly, although defendant may suffer from a depressive disorder, there is no evidence that her symptoms of depression render her "unable to understand the nature and consequences of the proceedings against [her] or to assist properly in [her] defense." *See* 18 U.S.C. § 4241(d). While the MMPI-2 and PAI results are unhelpful in assessing defendant's distress due to the aforementioned and undisputed blatant exaggeration, both psychologists testified that defendant reported some symptoms of depression, including episodic crying, diminished energy, and isolated suicidal ideation, and that she was taking various anti-depressant medications at the time of her examinations.

Regardless, the presence of mental illness does not require a finding of incompetency. *See Wolfson*, 616 F. Supp. 2d at 415 (citing *Vamos,* 797 F.2d at 1150). Despite defendant's symptoms of depression, she expressed a basic understanding of the charges against her, the evidence, the government's plea offer, and the roles of the court, prosecutor, defense counsel, and jury. She was able to explain to Dr. Rosenfeld (1) the range of custodial terms she faces, (2) that she faces

---

that defendant's responses to the assessments, upon which Dr. Janoson relied in formulating his opinion, were grossly exaggerated.

deportation after conviction, (3) that she would rather be deported than serve a prison term, and (4) that she would likely lose at trial based on a prior statement she had given. Dr. Rosenfeld also testified that defendant expressed confidence in her attorney, Mr. Martin, and a willingness to work with and assist him.

The court also considers defense counsel's assessment of defendant's ability to assist in her case. "The opinion of a defendant's attorney as to [the defendant's] ability to understand the nature of the proceedings and to cooperate in the preparation of his defense, is indeed significant and probative." *United States v. Sandoval*, 365 F. Supp. 2d 319, 326 (E.D.N.Y. 2005) (quoting *United States ex rel. Roth v.* Zelker, 455 F.2d 1105, 1108 (2d Cir. 1972), *cert.* denied, 408 U.S. 927 (1972)).

Defense counsel asserts that defendant cannot enter a plea because she claims that she is unable to recall any of the facts related to the alleged offense conduct. (*See* Def.'s Letter at 3.) There is no evidence, however, that Ms. Robertson's selective amnesia is a product of any mental illness from which she suffers; significantly, both psychologists agreed that if defendant's amnesia was limited to the charged conduct giving rise to her arrest and prosecution (and no other events from the same time period) then her claims of amnesia may not be

credible.  Regardless of whether defendant is or is not

suffering from amnesia regarding the alleged crime, however,

> A defendant's amnesia about events surrounding
> the crime will not automatically render [her]
> incompetent to stand trial. Rather, the propriety
> of trying a given amnesiac defendant must be
> determined in light of [her] own individual
> circumstances. Factors to be considered include
> whether the defendant has any ability to
> participate in [her] defense, whether the amnesia
> is temporary or permanent, whether the crime and
> the defendant's whereabouts at the time of the
> crime can be reconstructed without [her]
> testimony, whether the government's files will be
> of assistance in preparing the defense, and
> whether the government's case is strong or weak.

*Villegas*, 899 F.2d at 1341 (internal citations omitted).

In this case, the only problem that defendant and

defense counsel have reported with regard to her ability to

participate in her defense is her lack of memory relating to the

charged conduct.  Dr. Rosenfeld testified that defendant

reported being willing to work with her attorney and that she

was "capable of listening to any information you give her and

making a reasoned decision based on the information that's

presented to her."  (Oct. 16 Tr. at 118.)  Although it is

unclear whether defendant's purported amnesia is temporary or

permanent, the fact that it was first reported months after

defendant's arrest and does not appear to have affected her

memory regarding anything other than the circumstances of the

offense weigh against a finding that the amnesia will wholly

prohibit defendant from participating in her defense. *See*

*Villegas*, 899 F.2d at 1342-43 (affirming district court's

finding that the defendant was competent to stand trial where,

*inter alia*, the defendant had undoubtedly assisted his attorney

during the months between his arrest and the onset of the

amnesia-causing condition). Furthermore, the facts that aspects

of the defendant's alleged involvement in the charged offense

can be reconstructed without her testimony, the discovery

provided by the government will assist defense counsel in

preparing the defense, and the government's case is strong given

defendant's written confession weigh in favor of a finding of

competency.

In sum, there is no indication from defendant that she

cannot understand the proceedings or assist her lawyer in her

defense, despite any memory loss regarding the alleged criminal

activity or other mental health symptoms. Both psychologists

acknowledged that defendant had no trouble communicating with

them and providing a thorough personal history. Ms. Robertson

expressed knowledge and understanding of the consequences of a

plea, the possible custodial sentences she faces, and the

likelihood of deportation after her conviction. Thus, the court

finds that she is able to assist her counsel and sufficiently

understands the nature of the charges and criminal proceedings

against her. *See* 18 U.S.C. § 4241(d)

Other than the exaggerated, and thus invalid, MMPI-2 and PAI profiles, Dr. Janoson's basis for determining that defendant was not competent to enter a plea was her rating on the MacCat-Ca assessment, on which she scored low on the Understanding and Appreciation subtests.  However, at the competency hearing, Dr. Janoson testified that in response to an item on the MacCat-Ca, defendant was not sure "how she would fair [*sic*] in accepting a plea offer as compared to other defendants" and explained to him that "Rt now, she's talking 15 yrs, – why can't y lower it. Deport me rt away. My charges are 30-yrs stuff. I don't think I should go to jail."  (*See* Tr. at 55; Gov't Ex. 1 at 47.)  Even if her response may not have merited any points under the MacCat-Ca scoring rubric, it is clear that defendant exhibits an understanding of the consequences of a plea, and the nature of the charges against her.

Finally, the court's observations of Ms. Robertson during her appearances in her case thus far corroborate the credible testimony of Dr. Rosenfeld.  Defendant has appeared alert and able to follow the proceedings, has been responsive to the court's questions regarding scheduling, and has not exhibited any bizarre or otherwise inappropriate behavior. Thus, for the reasons stated above, after considering the testimony of Drs. Janoson and Rosenfeld, the evidence presented

at the competency hearing, the parties' submissions, and the court's own observations, the court finds by a preponderance of the evidence that defendant is competent to enter a plea and/or stand trial.

**SO ORDERED.**

Dated:   February 9, 2015
           Brooklyn, New York

_____/s/_____
Kiyo A. Matsumoto
United States District Judge
